1   ROBERT T. SULLWOLD (SBN 88139)
    JAMES A. HUGHES (SBN 88380)
2   SULLWOLD & HUGHES
    1999 Harrison Street, 18th Floor
3   Oakland, CA 94612-3520
    Telephone: 510-496-4616
4   Facsimile: 415-762-5338

5
    CURTIS JAY MASE (Florida Bar No. 478083)
6   CAMERON EUBANKS (Florida Bar No. 85865)
    MASE LARA
7   2601 Bayshore Drive, #800
    Miami, FL 33133
8   Telephone: 305-377-3770
    Facsimile: 305-377-0080
9

10  Attorneys for Defendant/Counter-Plaintiff
    MICHAEL E. CRIDEN, P.A. dba
11  CRIDEN & LOVE, P.A.

12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                     SAN FRANCISCO DIVISION
15

16  JOSEPH SAVERI LAW FIRM, INC., a          )   No. 3-14-01740 EDL
17  California corporation, and JOSEPH R.     )
    SAVERI,                                   )
18                                            )
                                              )   **CRIDEN & LOVE'S OPPOSITION**
19  Plaintiffs/Counter-Defendants,            )   **MEMORANDUM TO PLAINTIFFS'**
                                              )   **MOTION FOR SUMMARY**
20  v.                                        )   **JUDGMENT OR, ALTERNATIVELY,**
                                              )   **SUMMARY ADJUDICATION**
21  MICHAEL E. CRIDEN, P.A., dba CRIDEN &     )
    LOVE, P.A., a Florida corporation,        )
22                                            )
    Defendant/Counter-Plaintiff,              )
23  _____  )

24

25

26

27

28

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       TIO2 Action – Lieff Cabraser Referral Agreement . . . . . . . . . . . . . . . . . . 3

       Berger & Montague Referral Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 4

       Isaac Industries Files A Complaint In The TIO2 Action . . . . . . . . . . . . . . . . 4

       Saveri Files A Motion For Admission *Pro Hac Vice*
       On Behalf Of Isaac Industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

       Lieff Cabraser And Gold Bennett Become
       Co-Lead Counsel In The TIO2 Action . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       Breen Intervenes In The TIO2 Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       The May 2012 Telephone Conversation
       Between Kevin Love And Joseph Saveri . . . . . . . . . . . . . . . . . . . . . . . . . 5

       Saveri Files A Notice Of Appearance For
       Breen (Already Represented By Esades) . . . . . . . . . . . . . . . . . . . . . . . . . 5

       Saveri Does Not File A Notice Of Withdrawal
       Of His Representation Of Isaac Industries . . . . . . . . . . . . . . . . . . . . . . . . 6

       Saveri Chooses Not To Send The Notice Of Appearance To Love . . . . . . . . . . . . 6

       Saveri Lawyers File *Pro Hac Vice* Motions On Behalf Of Isaac Industries . . . . . . . 6

       The June 2012 Telephone Conversation
       Between Kevin Love And Joseph Saveri . . . . . . . . . . . . . . . . . . . . . . . . . 6

       While Representing Isaac Industries, Saveri Moves To Become Co-Lead
       Counsel And Represents To The Court That C&L Approves Of His Request . . . . . . 7

       Filing A Notice Of Appearance On Behalf Of Breen Had
       Nothing To Do With Saveri Becoming A Co-Lead Counsel . . . . . . . . . . . . . . . 8

       C&L's Practice Of Sending Out Reminder E-Mails. . . . . . . . . . . . . . . . . . . . 8

       Saveri Receives His First Reminder E-Mail From
       C&L In August 2012, But Does Not Inform C&L That
       He Does Not Intend To Honor His Referral Obligation . . . . . . . . . . . . . . . . . 9

Saveri Receives A Second Reminder E-Mail From
C&L In October 2013, But Does Not Inform C&L That
He Does Not Intend To Honor His Referral Obligation . . . . . . . . . . . . . . . . . . . . . . . 9

Saveri Recovers Approximately $10 Million In Attorney Fees . . . . . . . . . . . . . . . . 9

Saveri Finally Lets C&L Know That He Does Not
Intend To Honor His Referral Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Isaac Industries' Notice And Consent Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

The Notice Of Appearance Notwithstanding, Saveri Told
Love That He Would Have Saveri's Proposal To
Resolve His Referral Obligation By The Next Day . . . . . . . . . . . . . . . . . . . . . . . . . 11

Saveri Paid No One A Referral Fee On This $10 Million Recovery . . . . . . . . . . . . 11

Rule 2-200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

IV.    SAVERI IS NOT ENTITLED TO SUMMARY
       JUDGMENT ON ANY OF C&L'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

       A.    Breach Of Implied-In-Fact Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

             1    California Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

             2    By His Conduct, Saveri Entered Into An Implied-In-Fact
                  Contract With C&L To Pay C&L A 12.5% Referral Fee . . . . . . . . . . . . . . .13

             3    Saveri's Appearance For Breen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                  C&L Actually Testified That, Only After Saveri
                  Told C&L In 2014 He Would Not Pay Them, Did
                  C&L Conclude That Saveri Must Have Filed The Notice
                  For Breen To Try To Avoid His Referral Obligation . . . . . . . . . . . .15

                  C&L Did Not Review The Notice Until 2014 . . . . . . . . . . . . . . . . . 15

                  Even If C&L Had Seen The Notice, It Did Not
                  "Unambiguously" Reject C&L's Offer . . . . . . . . . . . . . . . . . . . . . . 17

                  California Uses An Objective Standard
                  To Determine Contract Formation . . . . . . . . . . . . . . . . . . . . . . . . . 17

       B.    Money Had And Received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       C.    Unjust Enrichment/Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

D.     Quantum Meruit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

E.     Fraud Claims (Misrepresentation And Concealment) . . . . . . . . . . . . . . . . . . . . . 24

F.     Fraud Claim (Constructive) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
## TABLE OF AUTHORITIES
2

3  *Barnes, Crosby v. Ringler*, 212 Cal.App.4th 172 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4  *Berger v. Home Depot USA*, 741 F3d 1061 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5  *Chambers v. Kay*, 29 Cal. 4th 142 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

6  *Crockett & Myers v. Napier, Fitzgerald*, 664 F.3d 282 (9th Cir. 2011) . . . . . . . . . . . . . . . 24

7  *DeLeon v. Verizon Wireless*, 207 Cal.App.4th 800 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8  *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal.App.3d 593 (1981) . . . . . . . . . . . . . . . . . . . . 19

9  *Desny v. Wilder*, 299 P.2d 257 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10  *Enloe Medical Center v. Principal Life Ins. Co.*, No. 10-2227, 2011 WL 6396517,

11      at *7 (E.D. Cal. Dec 20, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12  *Gardner v. Charles Schwab*, 267 Cal.Rptr. 326 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

13  *Gutierrez v. Girardi*, 194 Cal.App.4th 925 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

14  *Mink v. Maccabee*, 121 Cal.App.4th 835 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15  *Multifamily Captive Group v. Assurance Risk Managers*, 629 F.Supp.2d 1135 (E.D. Cal. 2009) . . . . . 23

16  *Noll v. eBay, Inc.*, 282 F.R.D. 462 (N.D. Cal 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17  *Pacific Corp v. Keck*, 232 Cal.App.4th 294 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18  *Potter v. Peirce*, 688 A.2d 894 (Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

19  *Richelle v. Roman Catholic*, 106 Cal.App.4th 257 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20  *Rutherford Holdings v. Plaza Del Rey*, 223 Cal.App.4th 221 (2014) . . . . . . . . . . . . . . . . . . . . 22

21  *S. Calif. Painters v. Best Interiors, Inc.*, 359 F.3d 1127 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 20

22  *Yu-Sze v. Buchholz*, No. 08-3535, 2013 WL 1165013 (N.D. Cal. March 20, 2013) . . . . . . . . . . . . 25

23

24

25

26

27

28

I.   **INTRODUCTION**

In 2010, without its own client, Lieff Cabraser accepted the referral of Isaac Industries (a Criden & Love client), was appointed Lead Counsel in a major antitrust class action while representing Isaac Industries, received millions of dollars in fees, and paid Criden & Love a 12.5% referral fee.

In 2012, Joseph Saveri, after leaving Lieff Cabraser to start his own firm, and also without his own client, was appointed Lead Counsel to the same antitrust class action while still representing Isaac Industries, and also walked away with approximately $10 million.  But Saveri did not pay Criden and Love (or anyone else for that matter) a referral fee.

The issue in this case is simple: Given Saveri's *conduct* during the case and taking into consideration the *equities* of the situation, should Saveri be allowed to keep the $10 million fee without paying a referral fee to Criden & Love.  Saveri's conduct included filing a Motion For Lead Counsel while representing Isaac Industries after Criden & Love told him that if he filed such a motion while representing Isaac Industries, he would owe Criden & Love a referral fee.  Saveri's Motion even included a representation by him to the Court that he had obtained the approval to file the motion by all counsel of record, including Criden & Love, which never would have supported his bid had he rejected Criden & Love's terms.  From the time he became Lead Counsel up until he was paid the $10 million, Saveri never once informed Criden & Love that he did not intend to honor the 12.5% referral obligation. As for the equities, Saveri himself admits that although he might have formally switched firms, he really just continued to perform the same Lead Counsel role he had at Lieff Cabraser, just at a different address – all the while, at both firms, representing Isaac Industries.  In the end, Saveri never would have found himself in a position to receive *any* fee had Criden & Love not made it possible for him to become Lead Counsel by referring its client to him while he worked at Lieff Cabraser.

Under these circumstances, a jury certainly could find that Criden & Love reasonably interpreted Saveri's conduct as a manifestation of assent to its offer.  Likewise, a jury could well find that allowing Saveri to retain the entire $10 million fee, a benefit conferred by Criden & Love, is unjust.  Saveri is therefore not entitled to summary judgment.

1

## II.     SUMMARY JUDGMENT STANDARD

As this Court held in *Mathews v. Orion Healthcorp.*, No. 13-4378, 2014 WL 4245986, at *6 (N.D. Cal. Aug. 27, 2014): "Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir. 1999)."

Likewise, "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." *See* Fed. R. Civ .P. 56(e)(2); *Anderson*, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323." *Mathews*, 2014 WL 4245986, at *6.

At the summary judgment stage, a judge "does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Id.* at 928. Summary judgment is therefore not

1    appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts

2    . . . ." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980). "Put

3    another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary

4    judgment must be denied." *Metro. Life Ins. Co. v. Oyedele*, No. 12-4607, 2014 WL 4755627, at *2

5    (N.D. Cal. Sept. 24, 2014).

6

7    III.   **FACTS**

8                                        **Background**

9          Federal antitrust law grants standing only to those companies that purchase a price-fixed product

10   directly from an antitrust defendant.  Although there are many law firms that prosecute federal antitrust

11   class actions, they cannot file a case without a client who has standing.  (Saveri Depo. 81:25-82:2.)

12   C&L's law practice includes referring clients to other larger antitrust law firms with the expectation that

13   the law firm will become a lead counsel in the antitrust class action.  (Saveri Depo. 67:3-68:22, 141:2-

14   24; Love Decl. ¶ 5.)  In exchange for referring clients to these law firms, C&L generally receives a

15   12.5% referral fee.  Given how difficult it is to acquire an antitrust plaintiff, it is not uncommon for C&L

16   to refer a client to several firms, each of which will pay C&L a referral fee.  (Love Decl. at ¶¶ 1-5; Love

17   Depo. 117:22-118:3, 125:7-24.)  C&L will generally also perform work in the case, which they are

18   separately compensated for.  (Love Decl. ¶ 5.)

19

20                          **TIO2 Action – Lieff Cabraser Referral Agreement**

21         Isaac Industries is C&L's client.  On February 7, 2010, Isaac Industries retained C&L, Lieff

22   Cabraser and any other law firm C&L decided to associate with to prosecute the TIO2 action.  (Exh. A

23   to Love Decl.; Avan Decl. ¶¶ 2, 3.)  It was Isaac Industries' understanding that C&L would receive

24   referral fees from Lieff Cabraser and any other law firms representing Isaac Industries in the TIO2

25   Action.  (Avan Decl. ¶ 4.) On February 8th, C&L and Lieff Cabraser entered into a referral agreement

26   wherein Lieff Cabraser agreed to pay C&L 12.5% of their recovery in the TIO2 Action.  (Exh. B to

27   Love Decl.)  Joseph Saveri ("Saveri"), who was Chairman of Lieff Cabraser's Antitrust Group at the

28

time of filing, agreed to the 12.5% referral that same day.   (Exh. 24 to Love Depo.; Saveri Depo. 86:18-87:6.)

### Berger & Montague Referral Agreement

On February 9, 2010, in consideration of referring Isaac Industries to Berger & Montague, P.C. ("B&M") for the TIO2 Action, B&M agreed to pay C&L a 12.5% referral fee.  (Exh. C to Love Decl.)

### Isaac Industries Files A Complaint In The TIO2 Action

Gold Bennett Cera & Sidener, LLP ("Gold Bennett") filed the first TIO2 complaint on behalf of Haley Paint Company in Baltimore on February 9, 2010.   (Love Decl. ¶ 9.)  Three days later, Lieff Cabraser, B&M and C&L filed a complaint in Baltimore with Isaac Industries as the plaintiff.  Saveri is listed as counsel for Isaac Industries.  (Exh. D to Love Decl.; Love Decl. ¶ 10; Saveri Depo. 199:18-24.)

### Saveri Files A Motion For Admission *Pro Hac Vice* On Behalf Of Isaac Industries

A week after the Isaac Industries Complaint was filed, Saveri filed a Motion for *Pro Hac Vice* "as counsel for Isaac Industries, Inc."  (Exh. E to Love Decl.; Love Decl. ¶ 11.)

### Lieff Cabraser And Gold Bennett Become Co-Lead Counsel In The TIO2 Action

On April 1, 2011, the Court in the TIO2 Action entered CMO No. 2, which appointed Lieff Cabraser and Gold Bennett as Co-Lead Counsel.  (Love Decl. ¶ 12.)

### Breen Intervenes In The TIO2 Action

On July 13, 2011, East Coast Colorants LLC ("Breen") filed a motion to intervene in the TIO2 Action.  On July 14, 2011, Vince Esades of Heins Mills & Olson, P.L.C. filed a Motion for *Pro Hac Vice* on behalf of Breen.  On July 29, 2011, the Parties to the TIO2 Action entered into a Stipulation wherein Defendants consented to the intervention.  Saveri signed the Stipulation on behalf of Isaac Industries.  Esades signed it on behalf of Breen.  The Court granted the motion to intervene and approved the Stipulation on July 29.  (Exhs. F, G to Love Decl.; Love Decl. ¶ 13.)

- 4 -

**The May 2012 Telephone Conversation Between Kevin Love And Joseph Saveri**

In May 2012, Joseph Saveri initiated a telephone call with Kevin Love ("Love") of C&L to discuss Saveri leaving Lieff Cabraser. (Saveri Depo. 146:18-23; Love Depo. 186:15-25 & 187:23-25; Exh. 74 to Saveri Depo; Love Decl. ¶ 14.) In that conversation, Saveri informed Love that he was leaving Lieff Cabraser to start his own law firm and that he intended to file a motion to be appointed Lead Counsel in the TIO2 Action while representing Isaac Industries. (Love Decl. ¶¶14-16,36; Saveri Depo. 147:23-151:15.) After Saveri told Love that he was going to move for  Lead Counsel while representing Isaac Industries, Love responded that if he moved for a third Co-Lead Counsel position while representing Isaac Industries, C&L would expect him to pay C&L a 12.5% referral fee. (Love Decl. ¶¶ 14-16, 36; Love Depo. 188:1-190:15; Saveri Depo. 150:7-151:2.)

It was important to Saveri to remain in the case as a lead counsel. (Saveri Depo. 157:9-24.) Specifically, Saveri told Love he wanted to continue the same structure: "A co-lead structure with Gold Bennett as one lead, Lieff Cabraser, me, as the other . . . and I wanted to continue that in the future." (Saveri Depo. 150:12-151:12; 153:10-12.)   In fact, Saveri did not consider his switching firms as actually ever leaving the TIO2 Action: "Well, I don't know[,] as I would [not] characterize it as coming back in because I don't think I ever left." (Saveri Depo. 209:18-20.)


**Saveri Files A Notice Of Appearance For Breen (Already Represented By Esades)**

Since Breen intervened in the case back in July 2011, it had been represented by Esades. Nonetheless, on June 1, 2012, nearly a year later, Saveri also filed a Notice of Appearance on behalf of Breen. (Exh. H to Love Decl.) Although the Notice of Appearance was filed by ECF, as a matter of practice, C&L does not review notices of appearance filed in a case.  (Love Depo. 191:8-192:13, 201:22-202:13.) Consequently, C&L did not review Saveri's Notice of Appearance when it received ECF notice of it.  (Love Decl. ¶ 20; Love Depo. 196:1-9, 191:8-12, 60:23-62:2, 192:16-19; Criden Depo. 51:5-20.)

**Saveri Does Not File A Notice Of Withdrawal Of His Representation Of Isaac Industries**

Neither on June 1, 2012 (when Saveri filed his Notice of Appearance on behalf of Breen), nor at any point after June 1, 2012, did Saveri ever file a notice of withdrawal of his appearance on behalf of Isaac Industries.  (Love Decl. ¶¶ 23-25.)   Saveri did not think filing a notice of withdrawal of his representation of Isaac Industries would be "prudent." (Saveri Depo. 163:7-15.)  Consequently, C&L never doubted that Saveri continued to represent Isaac Industries.  (Exh. 50 to Love Depo.; Love Depo. 210:25-212:16; Criden Depo. 53:24-54:6, 61:2-9.)   Saveri also failed to notify Isaac Industries that he was leaving Lieff Cabraser to start his new law firm.  (Saveri Depo. 168:22-169:20; Avan Decl. ¶¶ 5, 6.)

Because Saveri never withdrew from his representation of Isaac Industries, as of June 1, 2012 going forward, Saveri represented both Isaac Industries and Breen in the TIO2 Action.

**Saveri Chooses Not To Send The Notice Of Appearance To Love**

Saveri never mailed or e-mailed his Notice of Appearance to C&L. (Love Decl. ¶ 18.)  Nor did Saveri ever pick up the phone and tell C&L of the Notice of Appearance.  (Love Decl. ¶ 19.)  In fact, C&L did not learn of Saveri's Notice of Appearance until 2014, when Saveri tried to use it as an excuse to get out of paying his referral obligation.  (Love Decl. ¶¶ 52-54; Criden Depo. 61:11-13, 51:5-20.)

**Saveri Lawyers File *Pro Hac Vice* Motions On Behalf Of Isaac Industries**

On June 29, 2012, about a month after Saveri's Notice of Appearance for Breen, lawyers in Saveri's new law firm filed Motions for Admission *Pro Hac Vice* not just for Breen, but also for Isaac Industries and Haley Paint.  (Exhs. J, K to Love Decl.)

**The June 2012 Telephone Conversation Between Kevin Love and Joseph Saveri**

In June 2012, after Saveri filed his Notice of Appearance on behalf of Breen, Saveri and Love had another phone call.   At no time during the call did Saveri mention to Love his recent Notice of Appearance, or that he was rejecting the offer Love made to Saveri in the May 2012 call. (Love Decl. ¶¶ 20, 28-29.)

- 6 -

**While Representing Isaac Industries, Saveri Moves To Become Co-Lead Counsel
And Represents To The Court That C&L Approves Of His Request**

Consistent with the offer made by Love to Saveri in the May 2012 conversation, Saveri, while representing Isaac Industries, moved the TIO2 Court to add his new law firm as a Co-Lead Counsel. (Exh. L to Love Decl.; Love Decl. at ¶¶ 30-31.)  In fact, Saveri represented to the TIO2 Court that C&L did not object to his Motion: *"All Plaintiffs' counsel of record here support the present request that the Joseph Saveri Law Firm be included with Lieff Cabraser and [Gold Bennett] as Interim Co-Lead Class Counsel."*  (Exh. L to Love Decl.; Love Decl. at ¶¶ 33-34) (emphasis added) (Saveri Depo. 176:11-22.)  C&L was counsel of record when Saveri filed his motion.  (Saveri Depo. 176:12-177:3.)

And Saveri had been told by C&L that it would only support his request to become a third Co-Lead Counsel while representing Isaac Industries if he agreed to pay C&L a 12.5% referral fee.  (Love Decl. at ¶¶ 36-37.)   C&L interpreted and understood Saveri's conduct in moving for lead counsel as acceptance of C&L's offer, and therefore expected Saveri to pay C&L a 12.5% referral fee on any recovery his new law firm recovered in the TIO2 Action.  (Love Decl. at ¶ 36-39; Love Depo. 84:22-85:12.)

When asked how he secured C&L's approval for the Motion, Saveri responded:

> "Well, look, I – I believed frankly that – and I still believe that I and my firm did an excellent job and that the – that the work we did spoke for itself, *and there was no reason to believe that anybody would not support my motion, particularly if the issue was on the payment of a – of a referral fee."*

(Saveri Depo. 178:15-21.)  In reality, had Saveri told C&L that he was not intending to pay C&L a referral fee before he filed his motion, C&L would have told Saveri and Co-Lead Counsel that C&L opposed Saveri's request, and if necessary, would have also informed the Court in the TIO2 Action of C&L's opposition.  (Love Decl. ¶ 37; Love Depo. 81:16-84:5, 220:25-221:7; Criden Depo. 97:16-22.)[1]

---

[1]  Allowing Saveri back into the TIO2 Action as a Co-Lead Counsel necessarily diminished the amount of work that the other Co-Leads could perform in the case.  Or put another way, all the work that Saveri did in the case at his new firm would have been work that he would have performed at Lieff Cabraser. Thus, unless Saveri pays C&L the same referral fee that Lieff Cabraser agreed to pay C&L, Saveri leaving Lieff Cabraser and becoming a lead counsel in the TIO2 Action necessarily decreased the amount of referral fee C&L recovered from Lieff Cabraser and B&M.  (Love Depo. 161:8-18.)  *See*

### Filing A Notice Of Appearance On Behalf Of Breen Had
### Nothing To Do With Saveri Becoming A Co-Lead Counsel

In his motion to become to Co-Lead Counsel, Saveri did not mention to the Court that he had made an appearance for Breen.  (Love Decl. at ¶ 21; Saveri Depo. 181:3-5.)  Instead, his request was justified by the work he had performed while representing Isaac Industries at Lieff Cabraser as lead counsel: "At the time of CMO No. 2, attorney Joseph R. Saveri served as head of the antitrust and intellectual property practice group at Lieff Cabraser and had primary responsibility within that firm for representing Plaintiffs in this matter.  Effective May 29, 2012, Mr. Saveri left Lieff Cabraser and opened up his own law practice, the Joseph Saveri Law Firm, where he continues to play a leadership role in representing the Plaintiffs in the present matter, along with Lieff Cabraser and [Gold Bennett]."  (Exh. L to Love Decl.; Love Decl. at ¶¶ 33-34.)[2]  Not only did Saveri decline to inform the Court of his Notice of Appearance for Breen, but the Notice was irrelevant to Lieff Cabraser and Gold Bennett's decision to support Saveri's request.  (Cera Depo. 19:1-12; Fastiff Depo. 59:21-60:2; Love Decl. at ¶¶ 40-41.)

### C&L's Practice of Sending Out Reminder E-Mails

Given that antitrust actions can take several years until they resolve, it is C&L's practice to send out reminder e-mails to firms with referral obligations in order to remind them of their referral obligations.  (Love Depo. 216:24-217:4; Criden Depo. 67:13-23, 76:11-77:16.)  These reminder e-mails usually include a request to confirm the obligation.  In most cases, lawyers do not bother responding to the e-mails even though they all honor their referral obligations at the end of the case.  (Love Decl. at ¶ 42; Love Depo. 208:6-210:20, 233:12-22; Criden Depo. 69:14-70:9.)  For example, in the TIO2 case,

---

Saveri Depo. 221:3-12: (Q: If you had stayed at Lieff Cabraser would you have continued to work on the titanium dioxide case?  A: There is no doubt in my mind.  Q: And if you had stayed there, would your role have been the same in the titanium dioxide case as it had been before?  A: I would anticipate there was no reason to have a change.  I mean, as I said, part of the reason for what we did is to keep the continuity.").

[2]  Saveri admits that it is very unusual for a firm to be allowed to become a Co-Lead Counsel in the middle of a case: "Somebody would have done something wrong, somebody would have died, somebody would have gone out of business."  (Saveri Depo. 215:7-25)

C&L sent out a reminder e-mail to B&M.  B&M did not respond to the e-mail even though it requested B&M to confirm their referral obligation.  At the end of the case, B&M nonetheless paid C&L a 12.5% referral obligation.  (Love Decl. at ¶ 46-48.)

### Saveri Receives His First Reminder E-Mail From C&L In August 2012, But Does Not Inform C&L That He Does Not Intend To Honor His Referral Obligation

Consistent with C&L's practice of sending out reminder e-mails, Love sent Saveri an e-mail on August 8, 2012, congratulating him on his imminent promotion to Co-Lead Counsel and reminding him of his 12.5% referral fee.  Saveri did not send Love a response informing Love that Saveri did not intend to pay C&L a referral fee.  (Love Decl. at ¶¶ 42-43.)  (Saveri Depo. 185:2-8.)

### Saveri Receives A Second Reminder E-Mail From C&L In October 2013, And Again Does Not Inform C&L That He Does Not Intend To Honor His Referral Obligation

In October 2013, after the TIO2 Action settled, Love sent Saveri a second reminder e-mail, which again referenced his referral obligation.  Saveri did not send Love a response informing him that he did not intend to pay C&L a referral fee.  (Love Decl. at ¶¶ 44-45; Saveri Depo. 186:14-187:14).

### Saveri Recovers Approximately $10 Million in Attorney Fees

Of the $54 million in attorney fees awarded by the Court in the TIO2 Action, Saveri recovered approximately $10 million.[3]  In requesting fees from the Court, Saveri noted that, at his new law firm, he was simply continued the Co-Lead Counsel role he had enjoyed at Lieff Cabraser:  "I have continued my leadership position in the case, exercising day-to-day management and supervision over the litigation."  (Exh. P to Love Decl.; Love Decl. at ¶¶ 50-51.)

---

[3] The exact amount of Saveri's recovery has been designated confidential by Saveri.  Pursuant to the Protective Order, C&L has met and conferred with Saveri without being able to resolve this issue.  C&L anticipates Saveri will file a motion with the Court by January 29, 2015, in order to keep the exact amount of his recovery confidential.  C&L expects the Court to rule that Saveri's recovery is not confidential, but because the exact amount is not necessary to resolve Saveri's Motion for Summary Judgment, there is no reason for the Court to decide the issue on an expedited basis.  Nonetheless, C&L stands ready to file the information with the Court under seal if the Court deems it necessary to resolve the Motion for Summary Judgment.

**Saveri Finally Lets C&L Know That He Does Not Intend To Honor His Referral Obligation**

In early 2014, Saveri and Love again spoke on the phone.  (Love Decl. at ¶ 52; Saveri Depo. 173:5-6.)  At this point, Saveri had received his $10 million fee.  Love asked Saveri when he planned to pay his 12.5% referral fee.  (Saveri Depo 173:10-13.)  Saveri responded that he had filed a Notice of Appearance on behalf of Breen back in June 2012 and that therefore he did not owe C&L a referral fee.  (Love Decl. at ¶¶ 52-54.)  This was the first time Saveri had told anyone at C&L about the Notice of Appearance, that it was intended as a rejection of C&L's offer, and that he did not intend to honor his referral obligation because of its filing.  (Love Decl. at ¶¶ 53-54; Love Depo. 60:23-62:2, 64:3-10.)

It was only *at this point* (after Saveri had finally informed Love that he did not intend to pay the referral fee because of the Notice of Appearance) that C&L concluded that Saveri must have filed the Notice of Appearance in an attempt to avoid his referral obligation.  (Love Depo. 62:7-17, 94:15-21; Criden Depo. 55:7-22.)  At no time *before* the 2014 phone call with Saveri did C&L arrive at this conclusion because it was not until then that Saveri finally informed Love that he did not intend to pay C&L a referral fee.

Even if C&L had seen the Notice of Appearance before Saveri moved to become a Co-Lead Counsel, it would not have occurred to C&L that it was a rejection of the offer made by Love in the May 2012 call because Saveri *never* filed a notice of withdrawal of appearance of Isaac Industries, and then represented to the Court in his Motion for Lead Counsel that C&L supported the motion. In fact, had C&L become aware of Saveri's Notice of Appearance for Breen at the time Saveri filed his Motion for Lead Counsel, C&L would have likely thought that Saveri did it simply because he thought that it would help convince Lieff Cabraser, Gold Bennett and/or the Court to grant his request.  (Love Decl. at ¶¶ 55-56, 40-41; Saveri Depo. 180:14-181:9.)

**Isaac Industries' Notice And Consent Letter**

On July 28, 2014, David Avan, President of Isaac Industries, executed a Notice and Assent Letter, agreeing to a 12.5% referral fee for C&L to be paid by Saveri.  (Exh. Q to Love Decl.; Love Decl. at ¶ 63; Avan Decl. ¶¶ 4, 7.)

- 10 -

**The Notice Of Appearance Notwithstanding, Saveri Told Love That He Would
Have Saveri's Proposal To Resolve His Referral Obligation By The Next Day**

It is not unusual at the end of a successful case for firms to try to "negotiate" the referral fee. (Love Decl. at ¶ 57.)  During Saveri and Love's 2014 phone call, Love told Saveri that his Notice-of-Appearance-For-Another Client argument made no sense, and that Saveri still owed C&L a 12.5% referral fee.  In fact, Love believed that Saveri owed C&L a referral obligation, regardless of whether Saveri represented Isaac Industries when he moved to become a Co-Lead Counsel, because Saveri simply continued the leadership position at his new law firm that he had obtained while representing Isaac Industries.  (Love Decl. at ¶ 58; Love Depo. 85:14-18; Saveri Depo. 150:12-151:12, 153:10-12, 176:11-22, 208:6-214:8.)

In response to Love's demand for C&L's referral fee, Saveri said that he would have "a proposal" to Love by the close of the next day.  According to Saveri, he changed his mind and decided not to send a proposal to C&L partly because C&L received referral fees from other firms and because C&L had already received payment for the hours it put into the case. (Love Decl. at ¶¶ 59-61; Love Depo. 89:15-90:15, 234:2-4, 236:2-5; Criden Depo. 96:8-97:4; Saveri Depo. 174:11-13, 174:20-175:1.)  Saveri admits, however, that it is not unusual for referring firms to also work on antitrust cases. (Saveri Depo. 69:12-70:2; Love Decl ¶ 5.)  It is also not unusual for firms to receive more than one referral fee in a single case. (Love Decl. ¶ 5; Avan Decl. ¶ 4.)

The TIO2 Action came to an end in October 2014 with the final distribution to Class Members. (Saveri Depo. 217:10-16).

**Saveri Paid No One A Referral Fee On His $10 Million Recovery**

Remarkably, despite the fact that Saveri did not have his own client, and having recovered approximately $10 million as a Lead Counsel,  Saveri did not pay any law firm a referral fee. (Saveri Depo. 175:2-4, 208:1-3.)

1

**Rule 2-200**

2      Saveri was familiar with Rule 2-200 of the California Rules of Professional Conduct from the

3  time he started at Lieff Cabraser up through the time he became Chair of the Antitrust Group at Lieff

4  Cabraser. (Saveri Depo. 37:4-38:10.)  Yet, Saveri never discussed Rule 2-200 with C&L (a Florida law

5  firm), either before or during the TIO2 Action.  The circumstances surrounding C&L's referral to Lieff

6  Cabraser in conjunction with Saveri's knowledge of Rule 2-200 required Saveri to inform C&L of Rule

7  2-200's requirements.  (Love Depo. 102:15-104:25.)

8

9  **IV.  SAVERI IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF C&L'S CLAIMS**

10      **A.  Breach of Implied-In-Fact Contract**

11          **1.      California Law**

12      In Count I, C&L alleges that C&L and Saveri entered into an Implied-In-Fact Contract.  "An

13  implied in fact contract is one, the existence and terms of which are manifested by conduct."  Civ. Code,

14  § 1621.  "Conduct will create a contract if the conduct of both parties is intentional and each knows, ***or***

15  ***has reason to know***, that the other party ***will interpret the conduct*** as an agreement to enter into a

16  contract."  California Advisory Committee on Civil Jury Instructions ("CACI") No. 305 (emphasis

17  added).   Likewise, a party's conduct will be considered "assent" if he has reason to know that the other

18  party ***may infer*** from his conduct that he assents.  Restatement Second of Contracts, § 19(2).

19      Mutual consent necessary to the formation of a contract is determined under an "***objective***

20  ***standard***" applied to the outward manifestations of the parties' conduct.  *DeLeon v. Verizon Wireless*,

21  207 Cal.App.4th 800, 813 (2012).  Thus, the ***unexpressed intentions*** or understanding of the parties are

22  ***irrelevant*** to contract formation.  Only the objective understanding of their conduct matters.  *Id.*  Thus,

23  parties may become bound to a contract, "regardless of their subjective intent, by action constituting an

24  implied manifestation of assent ***reasonably interpreted as such by the other party***."  *Gardner v. Charles*

25  *Schwab*, 267 Cal.Rptr. 326, 330-32 (1990) (emphasis supplied).

26      Because California uses an objective standard to determine contract formation, ***California***

27  ***recognizes an implied in fact contract even if there is no meeting of the minds***.  The no-meeting-of-

28  the-minds variety of implied-in-fact contract exists where the parties' outward conduct meets an

- 12 -

objective standard for the manifestation of assent despite the lack of actual mental assent (*i.e.*, subjective assent). *Id.* In this way, California "protects the reasonable expectations of the parties." *Id.* "This position is also in accord with the general rule that *a party may be bound by a contract even though it does not intend to be so bound*, since it is the reasonably understood expression of *assent*, whether expressly through words or impliedly through conduct, and not the *intent* of the parties which is relevant." *Id.* (emphasis supplied) (holding that the trial court did not err by instructing the jury that parties may be bound "regardless of their subjective intent, by actions constituting an implied manifestation of assent reasonably interpreted as such by the other party."); *see also Desny v. Wilder,* 299 P.2d 257 (1956).

### 2. By His Conduct, Saveri Entered Into An Implied-In-Fact Contract With C&L To Pay C&L A 12.5% Referral Fee

When the TIO2 Action began, Saveri, as Chairman of the Antitrust Group at Lieff Cabraser, agreed to pay C&L a 12.5% referral fee so that he and Lieff Cabraser could file a complaint in the TIO2 litigation with C&L's client, Isaac Industries, and secure a lead counsel position. (Love Decl. ¶¶ 6, 7.) After filing the Complaint, Saveri filed an appearance on behalf of Isaac Industries, and Lieff Cabraser eventually was appointed Co-Lead Counsel, along with Gold Bennett. (Love Decl. ¶¶ 11, 12; Exh. E to Love Decl.) Saveri ran the case as Lead Counsel for Lieff Cabraser for more than two years until he decided to leave the firm in May 2012. (Love Decl. ¶ 15.)

In May 2012, Saveri initiated a telephone call with Kevin Love to discuss his plans to leave Lieff Cabraser. (Saveri Depo. 146:18-23; Love Depo. 186:15-25, 187:23-25; Exh. 74 to Saveri Depo.; Love Decl. ¶ 14.) In that conversation, Saveri told Love that he was leaving Lieff Cabraser to start his own law firm and that he intended to file a motion in order to continue acting as Lead Counsel in the TIO2 Action while representing Isaac Industries at his new law firm. (Saveri Depo. 147:23-151:15; Love Depo. 188:1-190:15.) It was important to Saveri to remain in the case acting as a Lead Counsel. (Saveri Depo. 157:9-24.) Specifically, Saveri told Love he wanted to continue the same structure: "A co-lead structure with Gold Bennett as one lead, Lieff Cabraser, me, as the other . . . and I wanted to continue that in the future." (Saveri Depo. 150:12-151:12; 153:10-12.) In fact, Saveri did not consider his

- 13 -

switching firms as actually ever leaving the TIO2 Action: "Well, I don't know[,] as I would [not] characterize it as coming back in because I don't think I ever left." (Saveri Depo. 209:18-20.)

Love told Saveri that if Saveri wanted to remain Co-Lead Counsel by moving for a Co-Lead Counsel position while representing Isaac Industries, C&L would expect him to pay C&L a 12.5% referral fee.  (Love Decl. ¶¶ 14-16; Love Depo. 188:1-190:15; Saveri Depo. 150:7-151:2.) Consistent with the offer made by Love to Saveri in the May 2012 conversation, Saveri, while representing Isaac Industries, filed a motion in August 2012 to be appointed a Co-Lead Counsel.  (Exh. L to Love Decl.; Love Decl. at ¶¶ 30-31.)

Evidencing his assent to C&L's offer, Saveri represented to the Court that C&L did not object to his motion to remain Co-Lead Counsel: "*All Plaintiffs' counsel of record here support the present request that the Joseph Saveri Law Firm be included with Lieff Cabraser and [Gold Bennett] as Interim Co-Lead Class Counsel*."  (Exh. L to Love Decl.; Love Decl. at ¶¶ 33-34) (emphasis added) (Saveri Depo. 176:11-22.)  C&L was counsel of record when Saveri filed his motion.  (Saveri Depo. 176:12-177:3.)  *C&L reasonably interpreted and understood Saveri's conduct in moving for Lead Counsel as an acceptance of C&L's offer, and therefore expected Saveri to pay C&L a 12.5% referral fee on any recovery his new law firm recovered in the TIO2 Action*.  (Love Decl. at ¶ 36-39; Love Depo. 84:22-85:12.)

When asked how he secured C&L's approval for the Motion, Saveri responded:

> "Well, look, I – I believed frankly that – and I still believe that I and my firm did an excellent job and that the – that the work we did spoke for itself, *and there was no reason to believe that anybody would not support my motion, particularly if the issue was on the payment of a – of a referral fee.*"

(Saveri Depo. 178:15-21.)  No reason?  In reality, had Saveri told C&L that he was not intending to pay C&L a referral fee before he filed his motion, C&L would have told Saveri and Co-Lead Counsel that C&L opposed Saveri's request, and if necessary, would have also informed the Court in the TIO2 Action of C&L's opposition. (Love Decl. at ¶ 37; Love Depo. 81:16-84:5, 220:25-221:7; Criden Depo. 97:16-22.)

- 14 -

In the end, Saveri filed his motion to become a Co-Lead Counsel while representing Isaac Industries, and told the Court that C&L approved of the motion. Regardless of Saveri's "subjective intent," C&L reasonably interpreted Saveri's conduct as an implied manifestation of assent. Thus, under California's objective standard for contract formation, Saveri entered into an implied-in-fact contract with C&L to pay it a 12.5% referral fee.

### 3. Saveri's Appearance For Breen

In his Motion for Summary Judgment, Saveri claims that because C&L "admits" that Saveri's Notice of Appearance for Breen manifested Saveri's intent to "unambiguously" reject C&L's offer, C&L's Count for Breach of Implied-In-Fact Contract must be dismissed as a matter of law.

Saveri is incorrect for several reasons:

- <u>C&L Actually Testified That, *Only After Saveri Told C&L in 2014 He Would Not Pay Them*, Did C&L Conclude That Saveri Must Have Filed The Notice For Breen To Try To Avoid His Referral Obligation.</u> C&L <u>never</u> admitted that it reviewed Saveri's Notice of Appearance in 2012 (prior to his motion to Lead Counsel Motion) and <u>never</u> admitted that it understood it in 2012 to mean Saveri was rejecting C&L's offer. It was only in 2014, *after* Saveri had finally informed C&L that he did not intend to pay the referral fee *because* of the Notice of Appearance, that C&L concluded that Saveri must have filed the Notice of Appearance for Breen in an attempt to avoid his referral obligation. (Love Depo. 62:7-17, 94:15-21; Criden Depo. 55:7-22.) At no time *before* the **2014** phone call with Saveri did C&L reach this conclusion because it was not until **2014** that Saveri finally informed C&L that he did not intend to pay C&L a referral fee. (Love Decl. at ¶¶ 53-54; Love Depo. 60:23-62:17, 64:3-10, 94:15-21; Criden Depo. 55:7-22.)

- <u>C&L Did Not Review the Notice Until 2014.</u> It is undisputed that C&L did not see Saveri's Notice of Appearance for Breen before Saveri filed his Lead Counsel Motion. (Love Depo. 191:8-192:13.) Saveri never mailed or e-mailed it to C&L. (Love Dec. ¶ 18.) Saveri did not call C&L to tell them about the Notice. (Love Dec. ¶ 19.) In fact, Saveri chose not to even

mention to Love the Notice of Appearance when they spoke a few weeks after he filed the Notice. (Love Dec. ¶¶ 20, 28-29.)

Nevertheless, Saveri contends that C&L is "charged with notice" because the Local Rules for the Maryland District Court provide: "If a document is filed electronically, the notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent." Md.L.R. 102(1)(c).   But Rule 102(1)(c) is a Proof of Service rule.   C&L does not dispute that Saveri filed the Notice of Appearance and that it was received by C&L through the CM/ECF system.   Rather, C&L has testified that, as a routine business practice, it does not review notice of appearances filed in a case.   (Love Decl ¶ 20.)   The question therefore is not whether C&L received the Notice by CM/ECF notice, but rather did Saveri properly communicate a rejection in response to C&L's contract offer.   Certainly, a jury might conclude that filing a Notice of Appearance was not sufficient to put C&L on notice that Saveri was rejecting C&L's contract offer.

If Saveri was truly rejecting C&L's offer, one would think that Saveri would do more than just hope that one particular notice of appearance caught C&L's attention out of hundreds of notices filed that year in the dozen or so antitrust cases in which C&L received CM/ECF notice.   One would also think that Saveri would have followed up the Notice of Appearance with a letter to C&L advising them that the Notice was intended to reject C&L's offer.   Finally, one would think that he would have followed up "his rejection-by-notice-of-appearance" by discussing it on the phone call he had with Love right after he filed it.   But Saveri did none of these things.   It was as if Saveri filed the Notice of Appearance but secretly hoped that C&L would neither notice it nor glean Saveri's intention in filing it, until the case was over.   Certainly, a jury could determine that, under the circumstances, it was incumbent upon Saveri to have done more to make certain that C&L actually reviewed the Notice of Appearance and, more importantly, understood that Saveri filed it as a formal rejection of their offer.

1     •   Even If C&L Had Seen The Notice, It Did Not "Unambiguously" Reject C&L's Offer.  First, the

2         Notice of Appearance does not say anything about a rejection of C&L's offer.  Second, it does

3         not include a withdrawal of appearance for Isaac Industries.   Third, it is just a Notice of

4         Appearance.  C&L's offer did not hinge upon, one way or another, whether a plaintiff already in

5         the case allowed Saveri to file an appearance on their behalf.   Fourth, Saveri argues that the

6         Notice of Appearance, as a matter of law, could have no other purpose other than to reject

7         C&L's offer.  Even if C&L had seen the Notice of Appearance before Saveri moved to become a

8         Co-Lead Counsel, C&L has testified that it would not have occurred to it that Saveri was

9         rejecting the offer Love made to him in May 2012 *because, among other things, Saveri never*

10        *filed a notice of withdrawal of appearance of Isaac Industries.*   Even Saveri concedes that the

11        Notice of Appearance could be reasonably interpreted as simply a procedural belt-and-

12        suspenders maneuver to increase his chances of convincing Lieff Cabraser, Gold Bennett and the

13        Court that he deserved to be appointed Co-Lead Counsel.[4]   (Saveri Depo. 180:14-181:9.)

14        Likewise, C&L has testified that, had they actually seen the Notice in 2012, it would have likely

15        concluded, knowing that Saveri had not withdrawn his appearance for Isaac Industries, that

16        Saveri filed the Notice simply to help his chances to become Co-Lead Counsel.  (Love Decl. ¶¶

17        55-56; Love Decl. at ¶¶ 55-56, 40-41; Saveri Depo. 180:14-181:9.)  *See Enloe Medical Center v.*

18        *Principal Life Ins Co.*, No. 10-2227, 2011 WL 6396517, at *7 (E.D. Cal. Dec. 20, 2011)

19        (denying summary judgment on breach of implied-in-fact contract because the Court will not

20        "divine from the March 15 call record . . . that plaintiff was on notice that the call was not a

21        promise to pay.").

22

23    •   California Uses An Objective Standard to Determine Contract Formation

24        Even assuming that Saveri was harboring a *subjective intent* for his Notice of Appearance to act

25        as a rejection of C&L's offer, no "meeting of the minds" was necessary to form a contract

26

27    [4] Judging by the memorandum in support of Saveri's Lead Counsel Motion as well as the testimony of
      Lieff Cabraser and Gold Bennett, the Notice of Appearance had absolutely no effect on the lawyers or
28    the judge. (Cera Depo. 191-12; Fastiff Depo. 59:21-60-2; Love Decl. ¶¶ 40-41.)

between Saveri and C&L.  Because California law protects the "reasonable expectations of the parties," the issue is not what Saveri's *intent* was in filing the Notice of Appearance.  Instead, using an objective standard, the issue is what *C&L would have reasonably understood* the filing of Notice of Appearance to mean.

Viewing the entirety of Saveri's conduct (as discussed immediately below), in the light most favorable to C&L, and giving C&L the benefit of all reasonable inferences, C&L submits that a genuine issue remains for trial as to whether C&L reasonably understood Saveri's conduct as manifesting assent to C&L's offer.

First, Saveri never withdraw his appearance for Isaac Industries.  C&L's offer was not contingent upon whether Saveri filed an appearance on behalf of another client already in the case.  Rather, it was contingent upon Saveri filing a Motion for Lead Counsel while representing Isaac Industries.  Love Decl. ¶¶ 14-16; Love Depo. 188:1-190:15; Saveri Depo. 150:7-151:2.)  And there is no dispute that Saveri did exactly that.  (Exh. L to Love Decl.; Love Decl. at ¶¶ 30-31.) Saveri filed a Motion for Lead Counsel while representing Isaac Industries, thereby complying with the precise terms of C&L's offer to the letter.

Second, Saveri's Motion for Lead Counsel did not mention that he had filed a Notice of Appearance for Breen.  Instead, the basis for Saveri's motion was the fact that he wanted to "continue to play the leadership role" he had enjoyed at Lieff Cabraser while representing Isaac Industries.  Saveri did not base this Lead Counsel Motion on the fact that he had made an appearance for a plaintiff that had intervened in the case back in 2011.  (Exh. L to Love Decl.)

Third, Saveri's motion represents that "*all* Plaintiffs' counsel of record here support the present request."  (Exh. L to Love Decl.) (emphasis added.)   Saveri knew when he made this representation to the Court (and everyone else reading the motion) that C&L's support for the

- 18 -

motion was contingent upon him agreeing to pay C&L a 12.5% referral fee.   Saveri's representation to the Court manifests a clear intent that Saveri was in fact agreeing to C&L's offer.   When asked about this statement, Saveri could only respond that he had not asked C&L whether they would support the motion prior to filing because "*there was no reason to believe that anybody would not support my motion, particularly if the issue was on the payment of a – of a referral fee.*"   (Saveri Depo. 178:15-21.)   But, of course, the reality is that C&L made it crystal clear to Saveri that it would not support his Lead Counsel Motion unless he agreed to pay them a referral fee.

Fourth, other conduct after his filed his Notice of Appearance for Breen evidences assent.  Saveri never sent C&L a letter or e-mail advising them that its offer has been rejected by the Notice of Appearance.  Nor did Saveri discuss it with C&L on the phone until 2014, even though he had a phone conversation with Love in June 2012 soon after it was filed.  Moreover, after the Notice of Appearance was filed, attorneys at Saveri's new law firm filed appearances on behalf of Isaac Industries in addition to the other two plaintiffs.  Finally, Saveri received two reminder e-mails from C&L that clearly showed that C&L did in fact believe Saveri had accepted their offer.  In response, Saveri could have easily hit the reply button to inform C&L that he never accepted C&L's offer.  Instead, Saveri remained silent until he received his $10 million fee.

Fifth, whether an implied-in-fact contract has been created is a question of fact for the jury to decide.  *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal.App.3d 593, 611 (1981); *see also Pacific Corp v. Keck*, 232 Cal.App.4th 294 (2014) ("where the existence of a contract is at issue and evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed.") ("Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed.").  If a reasonable jury could find that a party

expressed assent to an agreement, a triable issue of fact exists which precludes summary judgment. *See S. Calif. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1133-34 (9th Cir. 2004) ("whether or not the parties entered into an agreement is essentially a question of fact."). C&L submits that the facts in this case admits of more than inference and that the trier of fact should determine whether the parties entered into an implied-in-fact contract.

**B. Money Had and Received**

Count II is for money had and received. The claim is available when one person has received money which belongs to another and which in equity and good conscience should be paid over to the latter. *Gutierrez v. Girardi*, 194 Cal.App.4th 925, 937 (2011) ("This common count is available in a great variety of situations and lies wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter.") Here, Saveri was able to obtain a $10 million fee only because C&L referred Isaac Industries to him back in 2010. Even assuming that there was no implied-in-fact contract between the parties, the evidence in this case demonstrates that, as a matter of equity and good conscience, Saveri should pay C&L a 12.5% referral fee on his $10 million fee.[5]

Saveri challenges this claim by first arguing that Saveri's $10 million was based on his fee application. This fact is besides the point because that is exactly how referral fees work. One firm gets another firm into a case by referring them a client. That firm does work and gets paid, and then pays the referring firm a referral fee. Saveri next argues that the claim must fail because, like Saveri, C&L also received an attorney fee for the work it performed in the case. Again, this fact is irrelevant to the issue at hand: Whether Saveri owes C&L a referral fee on his $10 million recovery. C&L's claim for money had and received should therefore not be dismissed. *Cf. Girardi*, at 937 (holding that where a party misappropriates the proceeds of a settlement, the plaintiff may maintain a claim for money had and received).

---

[5] C&L discusses the equities of the case in the discussion of unjust enrichment below.

C. **Unjust Enrichment/Restitution**

The elements of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." *Berger v. Home Depot USA*, 741 F.3d 1061, 1070 (9th Cir. 2014).

While at Lieff Cabraser, Saveri rode C&L's client to a leadership position.   When he decided to leave Lieff Cabraser to start his own law firm, he wanted to continue in that same role: "A co-lead structure with Gold Bennett as one lead, Lieff Cabraser, me, as the other . . . and I wanted to continue that in the future." (Saveri Depo. 150:12-151:12, 153:10-12.)   In fact, Saveri did not consider his switching firms as actually ever leaving the TIO2 Action: "Well, I don't know[,] as I would [not] characterize it as coming back in because I don't think I ever left." (Saveri Depo. 209:18-20.)

Had C&L not referred Isaac Industries to him in 2010, Saveri never would have filed a complaint in the TIO2 Action and never would have become Lead Counsel in the case.   And Saveri does not dispute that becoming Lead Counsel at his new law firm was nothing more than allowing him to *continue* his "leadership role" in the case.   (Exh. L to Love Decl.)  It is also undisputed that Saveri's Notice of Appearance for Breen had nothing to do with Saveri "continu[ing] to play a leadership role" in the case.  Put another way, the only reason why Saveri became the third Lead Counsel and recovered a $10 million attorney fee was because he had previously worked on the case as a Lead Counsel at Lieff Cabraser.  And the only reason he was able to become a Lead Counsel at Lieff Cabraser was because C&L referred Isaac Industries to him.

Balancing the equities in this case, it is difficult to understand how Saveri should not be required to pay C&L a 12.5% referral fee.  Nonetheless, Saveri tries.

C&L addresses each argument below:

(1)   Saveri first contends that C&L may not advance both an unjust enrichment claim and a breach of contract claim.  That is incorrect as a matter of law.  *See Noll v. eBay, Inc.*, 282 F.R.D. 462, 468-69 (N.D. Cal. 2012) (refusing to dismiss claim for unjust enrichment even if claim was in conflict with breach of contract claim); *see also Rutherford Holdings v. Plaza Del Rey*, 223 Cal.App.4th 221, 231 (2014) (holding that a "claim for restitution is permitted even if the party inconsistently pleads a breach of contract claim that alleges the existence of an enforceable agreement.").

(2)     Saveri maintains that there can be no unjust enrichment as a matter of law because Lieff Cabraser and B&M paid C&L referrals.  Saveri does not explain how, as a matter of law, why equity does not require Saveri to pay a referral fee to C&L simply because C&L received two other referrals fees.  In fact, receiving several referral fees in one case is not uncommon in antitrust class actions.  (Love Decl. ¶ 5.)  Moreover, Saveri fails to explain how it would not be unjust to let Saveri dodge his referral obligation by filing a meaningless notice of appearance, while Lieff Cabraser and B&M honored their referral fee obligations to C&L.

Furthermore, allowing Saveri back into the TIO2 Action as a Lead Counsel necessarily diminished the amount of work that the other Lead Counsel firms could perform in the case.  Or put another way, all the work that Saveri did in the case at his new firm would have been work that he would have performed at Lieff Cabraser.  Thus, unless Saveri pays C&L the same referral fee that Lieff Cabraser agreed to pay C&L, Saveri leaving Lieff Cabraser and becoming a Lead Counsel in the TIO2 Action decreased the amount of referral fee C&L recovered from Lieff Cabraser.  (Love Depo. 161:8-18; Saveri Depo. 221:3-12.)

(3)     Saveri claims next that because Saveri made an appearance on behalf of Breen, C&L cannot maintain its unjust enrichment claim as a matter of law.  As discussed above, the Notice of Appearance proved to be worthless.  Co-Lead Counsel thought it was irrelevant.   And Saveri did not think it was important enough to even mention it in his Lead Counsel Motion so that the Court could consider it.  Furthermore, Saveri apparently filed it, but then did not discuss it with C&L until 2014, so that they would not oppose his Lead Counsel Motion.

(4)     Saveri also insists that, as a matter of law, there is no evidence that it would be "unjust" for Saveri to keep his entire $10 million recovery in the TIO2 Action.  Saveri ignores the fact that, had it not been for C&L, he never would have become Lead Counsel at Lieff Cabraser, and therefore would never have had the opportunity to "continue that role" at his new law firm.  In fact, Saveri did not even consider his switching firms as actually ever leaving the TIO2 Action: "Well, I don't know[,] as I would

1    [not] characterize it as coming back in because I don't think I ever left." (Saveri Depo. 209:18-20.)

2    Saveri also ignores the fact the work he did at his new law firm as Lead Counsel would have been work

3    he would have done as Lead Counsel at Lieff Cabraser.  Given these facts, and the fact that Saveri never

4    gave C&L the chance to oppose his Lead Counsel Motion (because, incredibly, he just did not think that

5    C&L would oppose it over a referral fee), C&L submits that there is sufficient evidence in the record to

6    make it unjust for Saveri to keep his entire $10 million fee without paying C&L a referral fee.  *See*

7    *Multifamily Captive Group v. Assurance Risk Managers*, 629 F.Supp.2d 1135, 1148 (E.D. Cal. 2009)

8    (summary judgment is improper where conflicting evidence presents a genuine issue of material fact as

9    to whether any benefit received was "unjust.")

10

11   (5)      Finally, Saveri argues that Rule 2-200 of the California Rules of Professional Conduct requires

12   dismissal of C&L's unjust enrichment claim for two reasons.  Saveri first points out that Breen did not

13   consent to Saveri paying a referral fee to C&L based on C&L's referral of Isaac Industries.  But Breen is

14   not C&L's client, was never referred by C&L to Saveri, and has nothing to do with Saveri recovering his

15   $10 million fee.  Breen's consent is irrelevant to C&L's unjust enrichment claim.

16

17        Saveri next argues that under *Chambers v. Kay*, 29 Cal. 4th 142 (2002) (firms should not split

18   attorney fees in violation of Rule 2-200), C&L cannot maintain its unjust enrichment claim against

19   Saveri.  Again, Saveri is incorrect.  First, Rule 2-200 will not be violated if Saveri pays C&L a referral

20   fee.  In *Chambers*, the referred client had not consented to a referral fee.  Here, Isaac Industries has

21   consented. (Avan Decl.)  *See Mink v. Maccabee*, 121 Cal.App.4th 835 (2004).  Second, even if Rule 2-

22   220 applied, California law recognizes a "bad guy" exception.  In *Barnes, Crosby, Fitzgerald & Zeman*

23   *v. Ringler*, 212 Cal.App.4th 172 (2013), the court held that a law firm who acts inequitably to prevent a

24   firm from complying with Rule 2-220 cannot then claim that Rule 2-200 prevents him from honoring his

25   referral obligation.  *Id.* at 186.  Here, Saveri knew of Rule 2-200 but never raised the issue with C&L,

26   either when he was at Lieff Cabraser or at his new law firm.  Third, it is questionable whether Rule 2-

27   200 even applies to out-of-state attorneys.  *See Potter v. Peirce*, 688 A.2d 894 (Del. 1997) (not allowing

28   a Delaware lawyer to be rewarded for violating division of fee rule by using it to avoid a fee obligation

- 23 -

to an unwary out-of-state lawyer); *Chambers*, 29 Cal.4th at 160 (noting that the *Potter* ruling was inapplicable to its holding because both lawyers in *Chambers* were California lawyers).

### D.  Quantum Meruit

Saveri argues that C&L's Quantum Meruit claim must be dismissed as a matter of law because Saveri insists "[t]here is no authority for the proposition that quantum meruit principles are applicable to referral fees."  Actually, in *Crockett & Myers v. Napier, Fitzgerald & Kirby*, 664 F.3d 282 (9th Cir. 2011), the Ninth Circuit held that when a firm refuses to pay another firm "referral fees," the referring firm is  entitled to a quantum meruit award.  In fact, the Ninth Circuit held that the award should "include the value of the client referral apart from the value of any other services [the plaintiff] performed" in the case.  *Id*. at 283 (holding that, on the facts of the case, the proper measure for quantum meruit was the value of the referral, which was determined to be 1/3 of the attorney fee).

### E.  Fraud Claims (Misrepresentation and Concealment)

According to Saveri, C&L's fraudulent misrepresentation and concealment claims "hinge on the theory" that Saveri "intended to deceive Criden into believing [Saveri] agreed to be bound by a referral agreement."  They all therefore must be dismissed, Saveri concludes, because C&L has admitted that the Notice of Appearance objectively signaled Saveri's intent not to pay.  *Id*.  The only problem with this argument is that it is not true.  As discussed above, it was not until 2014, when Saveri told C&L that he would not honor his referral obligation because of his Notice of Appearance for Breen that C&L first concluded that Saveri must have filed it to get out of paying C&L 12.5% of his fee.

### F.  Fraud Claim (Constructive)

Even though Saveri admits that he knew of Rule 2-200's requirements, and that it applied to the referral agreement between Lieff Cabraser and C&L, Saveri argues that he had no *fiduciary* duty to advise C&L (an out-of-state law firm) that their referral agreement may be in violation of Rule 2-200. He does not argue, however, that he did not have a confidential relationship with C&L.  A confidential relationship arises when one party is vulnerable to another and the stronger party prevents the weaker

- 24 -

1   party from protecting itself. *Yu-Sze Yen v. Buchholz*, No. 08-3535, 2013 WL 1165013, at * 4 (N.D. Cal.

2   March 20, 2013). "Vulnerability . . . is the necessary predicate of a confidential relation . . ." *Id*; *see*

3   *also Richelle v. Roman Catholic Archbishop*, 106 Cal.App.4th 257, 272 n. 6 (2003) (holding that a

4   confidential relationship "refers to an unequal relationship between parties in which one surrenders to

5   the other some degree of control because of the trust and confidence which he reposes in the other.

6   When a confidential relationship is found to exist, the one in whom confidence was reposed may be held

7   to a higher standard of disclosure and fairness than in an arm's-length relationship.   The cases are in

8   accord that the existence of a confidential relationship is a question of fact.").

9         As noted by the Court in *Potter v. Peirce*, *supra*, unwary out-of-state attorneys are sometimes

10   vulnerable to unscrupulous attorneys who try to use their own violation of an ethical rule in their home

11   state to avoid a contractual obligation.   C&L has provided sufficient evidence of its constructive fraud

12   claim that it should not be summarily dismissed.  (Love Depo. 102:15-104:25.)

13

14   **V.    CONCLUSION**

15         For the foregoing reasons, C&L respectfully requests that the Court deny Saveri's Motion for

16   Summary Judgment.

17   DATED: January 20, 2015                    CURTIS JAY MASE
                                                 CAMERON EUBANKS
18                                               MASE LARA

19                                               ROBERT T. SULLWOLD
                                                 JAMES A. HUGHES
20                                               SULLWOLD & HUGHES

21

22                                               By: /s/ Curtis J. Mase
                                                 Curtis J. Mase
23

24                                               Attorneys for Defendant and Counterclaimant
                                                 MICHAEL E. CRIDEN, P.A. dba CRIDEN &
25                                               LOVE, P.A

26

27

28

- 25 -