UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH SAVERI LAW FIRM, INC., et al.,<br>Plaintiffs,<br>v.<br>MICHAEL E. CRIDEN, P.A.,<br>Defendant. | Case No. 14-cv-01740-EDL<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 57 |

On January 6, 2015, Plaintiffs and Counter-Defendants Joseph Saveri and Joseph Saveri Law Firm, Inc. ("Plaintiffs") filed this motion for summary judgment. For the reasons set forth below, the Court GRANTS Plaintiffs' motion.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Joseph Saveri ("Plaintiff Saveri") is a former partner at Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"). (Saveri Decl. ¶ 1.) In June 2012, Plaintiff Saveri left Lieff Cabraser and founded Plaintiff Joseph Saveri Law Firm, Inc. ("Plaintiff Saveri Law Firm"). (Id. ¶ 9.)

In February 2010, while Plaintiff Saveri was still a partner at Lieff Cabraser, that firm entered into a referral agreement with Defendant and Counterclaimant Michael E. Criden, P.A. d/b/a Criden & Love, P.A. ("Defendant Criden" or "Defendant"), a Florida law firm. Through that agreement, Defendant Criden referred a client, Isaac Industries, Inc. ("Isaac Industries"), to Lieff Crabraser so that it could represent Isaac Industries in In re Titanium Antitrust Litigation, No. 10-cv-318 (D. Md.) ("TiO2 litigation"). In exchange, Lieff Cabraser agreed to pay Defendant a referral fee of 12.5 percent of any fees it received in the TiO2 litigation. (Love Decl. Ex. B.; Saveri Decl. ¶ 3.) The agreement states that:

> [Lieff Cabraser] agrees to pay [Defendant] a referral fee of 12.5% (Twelve and One Half Percent) of its fees, including any multiples on hours that it receives in this matter ("Total Fees"). Total fees does not include any monies received for reimbursement of expenses. Lieff Cabraser agrees to pay the referral fee to [Defendant] even if Lieff Cabraser later procures another client in this matter. If Lieff Cabraser receives significantly less than its lodestar in the case, [Defendant] agrees to discuss in good faith a reasonable accommodation to the amount of the referral fee.
>
> Both law firms agree that all disputes related to or arising from this referral agreement shall be resolved by arbitration conducted by the American Arbitration Association ("AAA").

(Love Decl. Ex. B.) Although Mr. Fastiff of Lieff Cabraser communicated acceptance of the agreement to Defendant Criden on behalf of the firm, Plaintiff Saveri was aware of the arrangement. (Love Decl. Ex. G.)

On February 12, 2010, Isaac Industries filed a complaint alleging a conspiracy to fix prices of titanium dioxide in the United States District Court for the District of Maryland. (Love Decl. ¶ 10.) That case was subsequently consolidated with a similar case, brought by Haley Paint Company, into the TiO2 litigation. (Saveri Decl. ¶ 7.) Plaintiff Saveri was admitted *pro hac vice* in the TiO2 litigation on behalf of Haley Paint Company and Isaac Industries. (See Saveri Decl. ¶ 7, Ex. 4.) On April 1, 2011, Lieff Cabraser and Gold Bennett Cera & Sidener, LLP ("Gold Bennett") were appointed as co-lead counsel. (Love Decl. ¶ 12.) On July 29, 2011, the TiO2 court granted a stipulation adding East Coast Colorants LLC d/b/a Breen Color Concentrates ("Breen") as a plaintiff. (Saveri Decl. ¶ 9.)

In May 2012, Plaintiff Saveri informed Mr. Love of Defendant Criden that he would be leaving Lieff Cabraser. (Love Decl. ¶¶ 14-15.) According to Mr. Love:

> [Plaintiff Saveri] said that he would want to enter appearances on behalf of, you know, clients that I'd given Lieff [Cabraser], and I said sure. And I said, you know, that we would expect you to respect the referral obligation that Lieff [Cabraser] had agreed to . . . . [Plaintiff Saveri] didn't say yes . . . but, you know, he didn't say no, what are you talking about or are you crazy.

(Saveri Decl. Ex. B (Love Depo.) at 188-89; see also 5/13/14 Love Decl. ¶ 35 ("In May 2012, Saveri called me to tell me that he was leaving Lieff Cabraser to start his own law firm, and wanted to know whether Saveri, at his new law firm, could continue to represent Isaac Industries

in the TIO2 litigation, and another C&L client in a different litigation. I responded that C&L was fine with him making his appearances so long as his new firm paid C&L the same referral fee that Lieff Cabraser agreed to in those cases."); 1/20/15 Love Decl. ¶¶ 15-16 ("Saveri told me that he was leaving Lieff Cabraser to start a new law firm and that he intended to file a motion to appoint himself as a third lead counsel in the TIO2 Action representing Isaac Industries. I then told Saveri that if he moved to become the third lead counsel while representing Isaac Industries, [Defendant Criden] would expect Saveri to pay [Defendant Criden] a 12.5% referral fee.")[1].) Plaintiff Saveri testified that he told Mr. Love that:

> I intended to continue to operate at the highest level of the case to continue to work as lead counsel . . . . [Mr. Love said] I expect or I want you to pay the 12 and a half percent referral obligation . . . . I said that I wanted to continue to – to do as I had in the past with the structure that we had. So I – I don't recall specifically saying I want to represent Isaac Industries . . . . [W]e had a leadership structure that prior to my – when I was at Lieff Cabraser, it was a co-lead structure with Gold Bennett as one lead, Lieff Cabraser, me as the other, Shapiro Sher as a liaison counsel. . . . That was the team that had been working on the case, and I wanted to continue that in the future.

(Supp. Love Decl Ex. B (Saveri Depo.) at 148-51; see also Saveri Decl. ¶ 12 ("At the time, I did not agree that the Joseph Saveri Law Firm or I would pay a referral fee or be bound – or intended to be bound – by Lieff Cabraser's agreement with Criden with respect to the referral of Isaac Industries.").)

On June 1, 2012, Plaintiff entered an appearance in the TiO2 litigation on behalf of Breen. (Saveri Decl. ¶ 9, Ex. 4.) Defendant Criden did not represent Breen and did not refer Breen as a

---

[1] Plaintiffs argue that this declaration contradicts Mr. Love's prior assertions and that it is therefore a sham pleading. (Reply at 9-10.) "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. . . . '[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) (quoting Foster v. Arcata Associates, 772 F.2d 1453, 1462 (9th Cir. 1985).) Furthermore, "the district court must make a factual determination that the contradiction was actually a 'sham.'" Id. at 267. Here, Plaintiffs have not shown that Mr. Love's January 20, 2015 declaration is a "sham" intended to create an issue of fact preventing summary judgment. Although the declaration amplifies Mr. Love's prior statements, it does not necessarily contradict them. Furthermore, Mr. Love's declaration is consistent with Plaintiff Saveri's deposition testimony.

client to either Plaintiff Saveri Law Firm or Hines Mills & Olson, the other law firm that represented Breen in the TiO2 litigation. (Saveri Decl. ¶ 9.) Although this notice of appearance was docketed on ECF, Defendant Criden states that it did not review the document when it received notice of its filing. (Love Decl. ¶ 20.)

Plaintiff Saveri did not withdraw his appearance on behalf of Isaac Industries (Love Decl. ¶ 23), and did not specifically inform Isaac Industries that he was departing from Lieff Cabraser. Rather, he "filed a notice . . . that [he] had opened [his] own firm and was appearing on behalf of a separate client." (Supp. Love Decl. Ex. B. (Saveri Depo.) at 168-169.) After June 1, 2012, Plaintiff Saveri never appeared specifically on behalf of Isaac Industries and Plaintiff Saveri Law Firm never entered into a fee agreement with Isaac Industries. (Saveri Decl. ¶¶ 10-11.) Similarly, after June 1, 2012, Plaintiffs never advised or reported to Isaac Industries as counsel, and never received instructions from Isaac Industries as a client. (Id. ¶ 13.) However, a June 29, 2012 *pro hac vice* application in the TiO2 litigation for Kevin Rayhill of Plaintiff Saveri Law Firm lists Mr. Rayhill "as counsel for Plaintiffs Haley Paint Company, *Isaac Industries, Inc.*, and [Breen]," and a July 25, 2012 *pro hac vice* application for Lisa J. Leebove of Plaintiff Saveri Law Firm lists Ms. Leebove as counsel for "Plaintiffs." (Supp. Love Decl. Exs. J, K (emphasis added).)

On August 7, 2012, Plaintiff Saveri Law Firm was added as co-lead class counsel in the TiO2 litigation. (Saveri Decl. Ex. 6.) The next day, Mr. Love of Defendant Criden sent Plaintiff Saveri an e-mail stating that:

> I saw that you applied to be co-lead in TIO2. Thats good news. Please confirm that you will by paying my firm a referral fee of 12.5% (the same Lieff agreed to pay us in this case.) Thanks.

(Saveri Decl. Ex. 11.) Plaintiff Saveri did not respond to this e-mail. (Love Decl. ¶ 43.)

In the Fall of 2013, the district court approved a settlement of the TiO2 litigation that awarded $54.5 million in attorneys' fees. (Saveri Decl. ¶ 19.) Defendant Criden received a total of $2,758,422.75 from the litigation, including $917,177.01 in referral fees from Lieff Cabraser. (Mot. at 11.) Plaintiff Saveri Law Firm received approximately $10 million. (Opp. at 9.)

On October 23, 2013, Mr. Love sent Plaintiff Saveri another e-mail that stated that:

> Michael [Criden] and I want to congratulate you on achieving such a

4

> tremendous result in the TIO2 case. As is our practice, I just wanted to remind you of your firm's 12.5% referral obligation, per our February 2010 agreement. I look forward to working with you on some new matters.

(Saveri Decl. Ex. 12.)  Plaintiff Saveri did not respond to this e-mail.  (Love Decl. ¶ 45.)

On April 15, 2014, Plaintiffs filed this action after they received an arbitration demand from Defendant seeking $1.2 million.  The complaint seeks to enjoin Defendant from proceeding with arbitration and seeks a declaration that Plaintiffs are not obligated to pay a referral fee to Defendant.  On July 23, 2014, this Court denied Defendant's motion to dismiss.  Subsequently, the arbitration proceedings were dismissed by the Parties. (Dkt. 52 (Joint Case Management Statement) at 1.)  On August 29, 2014, Defendant filed counterclaims for: (1) contract implied in fact; (2) money had and received; (3) unjust enrichment/restitution; (4) quantum meruit; (5) material misrepresentation; (6) constructive fraud; and (7) fraudulent concealment.

## II.    STANDARD

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

5

party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

## III. DISCUSSION

### A. Defendant's counterclaims for implied contract, money had and received, unjust enrichment, and *quantum meruit* fail because the alleged agreement violates California Rule of Professional Conduct 2-200

California Rule of Professional Conduct 2-200 provides that:

> A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
> (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and
>
> (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

Cal. R. Prof. Conduct 2-200(A). This rule has been broadly construed in order to protect the interests of clients. As the court in Barnes, Crosby, Fitzgerald & Zeman, LLP v. Ringler, 212 Cal. App. 4th 172 (2012), noted:

> Such agreements have the potential to motivate an attorney to charge excessive fees or to make tactical decisions unfavorable to the client's interests. Rule 2-200 alleviates these risks by requiring the attorneys to disclose, and obtain the client's written consent to, the fee-sharing arrangement. Such information may affect the client's level of confidence in the attorneys and is indispensable to the client's ability to make an informed decision regarding whether to accept the fee division and whether to retain or discharge a particular attorney. In this way, rule 2-200 protects the public and promotes confidence in the legal profession.

Id., 212 Cal. App. 4th at 180 (internal quotation marks and citations omitted). Although the rule itself does not provide a remedy, a violation of the rule can subject an attorney to discipline by the

1    bar. Id.

2    Significantly, "a noncompliant agreement generally *cannot be enforced* by an attorney."
3    Id. at 181 (emphasis added). Thus, in Margolin v. Shemaria, 85 Cal. App. 4th 891 (2000), an
4    attorney referred a client to another attorney, who agreed to obtain the client's written consent.
5    That consent was never obtained. Despite the fact that the referring attorney was told that the
6    client's consent would be obtained, the California Court of Appeals refused to uphold the
7    agreement, finding that the referring attorney's reliance was not reasonable because an attorney is
8    "presumed to have known that rule 2-200 requires actual written disclosure and written consent,
9    not a promise by the receiving attorney to provide that disclosure and secure that consent." Id. at
10   901. Furthermore, the court refused to provide equitable relief, reasoning that there had been no
11   "*unconscionable* injury" and that the failure to share "fees under the fee sharing agreement does
12   not constitute . . . *unjust* enrichment . . . since rule 2-200 exists for the benefit of clients." Id. at
13   901-02 (emphasis in original). Furthermore, the court noted that it also could not enforce the fee
14   sharing agreement because to do so would violate Rule 2-200 and would ignore the fact that the
15   rule is designed to protect clients, not attorneys. Id.; see also Mark v. Spencer, 166 Cal. App. 4th
16   219, 228-29 (2008). The sole authority for any exception to California's strict application of Rule
17   2-200 to not enforce fee-sharing agreements that violate the rule occurred in Barnes, where an
18   attorney inequitably took affirmative steps to block another attorney from complying with the rule.
19   Barnes, 212 Cal. App. 4th at 185-86. There, the plaintiff offered to prove that the defendants did
20   so by deliberately changing the named class representative after the original one had signed
21   written consent in order to evade the written referral fee agreement, and threatened to sue the
22   plaintiff firm if it contacted the new representative. The court reasoned that "the offending"
23   attorney is equitably estopped from wielding Rule 2-200 "as a sword to obtain unjust enrichment .
24   . . [u]nder the unique circumstances presented by this case." Id. at 186.

25   In this case, it is undisputed that Plaintiff Saveri Law Firm's client Breen did not give
26   consent to the alleged referral fee agreement. Therefore, the Court need not reach the close
27   question of whether there is a genuine dispute of material fact over the existence of the alleged
28   implied contract, which is doubtful, because even assuming such a dispute, enforcement of the

agreement would violate Rule 2-220. See Margolin, 85 Cal. App. 4th at 901-02; Chambers v. Kay, 29 Cal. 4th 142, 161 (2002) ("it would be absurd for this or any other court to aid [plaintiff] in accomplishing a fee division that would violate the rule's explicit requirement of written client consent and would subject [plaintiff] to professional discipline"). For the same reason, Rule 2-200 prevents the Court from granting equitable relief. See Margolin, 85 Cal. App. at 901-02.

Moreover, Isaac Industries was Lieff Cabraser's client. While Defendant argues that Plaintiffs continued to officially represent Isaac Industries after June 1, 2012, it is undisputed that after that time, Plaintiffs "never appeared specifically on behalf of Isaac Industries and Plaintiff Saveri Law Firm never entered into a fee agreement with Isaac Industries." (Saveri Decl. ¶¶ 10-11.) For the settlement, Defendant "Criden and Lieff Cabraser (not [Plaintiff Saveri] or personnel at [Plaintiff] Joseph Saveri Law Firm) conferred with Isaac Industries to advise [it] regarding the proposed settlement . . . and Vincent Esades of Heins – with [Plaintiff Saveri's] input – advised [their] client Breen on the same subject." (Id. ¶ 17.)

Defendant argues that the Court should apply the exception to Rule 2-200 recognized in Barnes "[u]nder the unique circumstances presented" there. 212 Cal. App. 4th at 186. However, that case represents an extremely narrow exception to what it otherwise describes as an unbroken line of cases that "uniformly recognize that an attorney cannot enforce a fee-sharing agreement if that attorney could have obtained written client consent as required by rule 2-200, but failed to do so." Id. at 181. Here, Defendant has not made any similar showing of unique circumstances like the deliberate substitution of class representatives in Barnes in order to evade a referral fee agreement, coupled with a refusal to allow contact with the class representatives in order to prevent written client consent. Rather, Mr. Saveri severed his relationship with his former law firm that had accepted the fee agreement, never expressed a willingness to be bound by that agreement and obtained a new, independent client, Breen. Defendant does not claim that it tried to obtain Breen's consent but Plaintiff frustrated such an attempt.

Finally, Defendant relies on Potter v. Peirce, 688 A.2d 894 (Del. 1997), for the proposition that Rule 2-200 should not apply to out-of-state attorneys. Defendant has not pointed to any California case that adopted the reasoning of Potter. Furthermore, the Potter court reasoned that

8

rewarding a Delaware attorney for violating Delaware's rules of conduct could "encourage non-compliance with the [rules] and create incentives for malfeasance among Delaware lawyers *at the expense of unwary out of state lawyers*." Id. at 897 (emphasis added).  That reasoning does not apply to Defendant here because attorneys from Defendant Criden, including Mr. Love and Mr. Criden, have appeared *pro hac vice* in California courts numerous times.  (See Bunzel Decl. Ex. B. (Love Depo.) at 24-26; Ex. G; Ex. H.)  Several of those appearances occurred in this court, requiring Defendant Criden's attorneys to certify compliance with Local Rule 11-4.  That rule, among other requirements, requires attorneys appearing *pro hac vice* to swear that they are familiar with "the standards of professional conduct required of members of the State Bar of California."  Thus, Defendant Criden is not ignorant of Rule 2-200.

Additionally, even assuming that Defendant Criden had no knowledge of Rule 2-200, Florida, where Defendant Criden is based, imposes a similar obligation on its attorneys:

> A division of fee between lawyers who are not in the same firm may be made only if the total fee is reasonable and:
>
> (1) the division is in proportion to the services performed by each lawyer; or
>
> (2) by written agreement with the client:
>
> (A) each lawyer assumes joint legal responsibility for the representation and agrees to be available for consultation with the client; and
>
> (B) the agreement fully discloses that a division of fees will be made and the basis upon which the division of fees will be made.

Florida State Bar Rule 4-1.5(G).  Although this rule allows for a referral agreement without the consent of the client if the fee "is in proportion to the services performed by each lawyer," the referral agreement here of 12.5% is *per se* a violation of Rule 4-1.5(G)(1) because it provides a fixed percentage of compensation.  See, e.g., Halberg v. W.M. Chanfrau, P.A., 613 So. 2d 600, 602 (Fla. Dist. Ct. App. 1993) (finding that a fee sharing agreement did not satisfy Rule 4-1.5(G)(1) where it provided for a fixed percentage of fee sharing and only stated that the fees "may" be adjusted based upon the amount of work each lawyer does); Marcus v. Garland, Samuel & Loeb, P.C., 441 F. Supp. 2d 1227, 1230 (S.D. Fla. 2006) (where a fee sharing agreement does

not satisfy Rule 4-1.5(G)(1), "[a]n attorney's fees contract between two attorneys and their client, is *void ab initio* as an illegal contract if the contract is not reduced to writing"). Because there was no written agreement with Breen disclosing the alleged referral agreement, the alleged contract also violates Rule 4-1.5(G)(2). Although Defendant cites cases that suggest that Rule 4-1.5(G) may not be used by an attorney in Florida to invalidate a fee sharing agreement with another attorney, Defendant does not contest that the alleged referral agreement violates Florida bar rules.

Thus, even assuming that there were a genuine dispute of material fact as to whether the alleged implied agreement existed, that agreement would nevertheless be unenforceable under California Rule of Professional Conduct 2-200. Therefore, the Court GRANTS Plaintiffs summary judgment as to Defendant's counterclaims for implied contract, unjust enrichment, money had and received, and *quantum meruit*.

**B.    Defendant's counterclaim for constructive fraud fails and does not change the above analysis on Rule 2-200**

Constructive fraud "is a unique species of fraud applicable only to a fiduciary or confidential relationship. . . . [A]s a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent." Assilzadeh v. California Fed. Bank, 82 Cal. App. 4th 399, 415 (2000). Thus, "[m]ost acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud." Id.

Here, Defendant claims that it was unaware of Rule 2-200 (despite its attorneys' appearances *pro hac vice* in this court which required it to certify to the contrary) and that Plaintiff Saveri had a duty to disclose the rule when Defendant entered into the referral arrangement *with Lieff Cabraser*. However, this claim fails because Plaintiffs did not owe Defendant a duty to disclose the existence of Rule 2-200. As an initial matter, Defendant conflates Plaintiff Saveri with Lieff Cabraser. Lieff Cabraser entered into the referral agreement at issue in this claim – not

Plaintiffs.[2] It is undisputed that Lieff Cabraser is a limited liability partnership. (Bunzel Decl. Ex. A (State Bar of California Record for Lieff Cabraser).)[3] Under California law, "[a] partner in a registered limited liability partnership is not liable . . . for debts, obligations, or liabilities . . . of . . . the partnership." Cal. Corp. Code § 16306(c). Furthermore, as noted above, Defendant has appeared *pro hac vice* numerous times in this state and is thus chargeable with knowledge of Rule 2-200. Additionally, a similar rule exists in Florida. Therefore, Potter does not suggest, as Defendant argues, that Plaintiffs owed Defendant a duty because Defendant was "vulnerable."

### C. Defendants' counterclaims for material misrepresentation and fraudulent concealment fail

Under California law, "the 'indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages.'" Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003) (quoting Moore v. Brewster, 96 F.3d 1240, 1245 (9th Cir. 1996)). Additionally, "the only intent . . . necessary to prove a case of fraud is the intent to *induce reliance.* Moreover, liability is affixed not only where . . . reliance is *intended* . . . but also where it is *reasonably expected* to occur." Lovejoy v. AT&T Corp., 92 Cal. App. 4th 85, 93 (2001) (emphasis in original).

Plaintiffs argue that these claims fail because they had no intent to induce reliance as they filed a notice of appearance that openly communicated an intent not to pay. (See Bunzel Decl. Ex. B. (Love Depo.) at 61-62 (acknowledging that the notice of appearance was an "attempt to support an argument for reducing the amount of the referral fee," albeit with hindsight as opposed to having seen the notice when it was filed); Bunzel Decl. Ex. C. (Criden Depo.) at 55 (same).) Indeed, Mr. Love testified in answer to the question do you believe "that Saveri's intent . . . was to

---

[2] Plaintiff Saveri was not the partner at Lieff Cabraser who communicated acceptance of the arrangement to Defendant Criden. (Saveri Decl. Ex. 1 (e-mail from Eric B. Fastiff of Lieff Cabraser accepting Defendant Criden's contract).) Thus, Defendant's allegation that Plaintiff Saveri "represent[ed] that the referral agreement complied with all applicable rules and regulations" is not supported by the record. (Dkt. 44 (Counterclaim) ¶ 87.)

[3] Plaintiffs ask that the Court take judicial notice of this exhibit. Defendant does not oppose the request and other courts have taken notice of similar exhibits. See, e.g., Jackson v. Med. Bd. of Cal., 424 F. App'x 670 (9th Cir. 2011) ("We grant appellee's request to take judicial notice of the California State Bar Association records."). Therefore, the Court GRANTS Plaintiffs' request.

avoid any referral obligation" that "yes, that's what I currently believe based on his conduct, yes. There doesn't seem to be any other explanation." (Love Depo. at 94.) Plaintiff Saveri also testified that this was his intent. (Saveri Decl. ¶ 11 ("The appearance by the Joseph Saveri Law Firm and me on behalf of Breen indicated that I did not agree to pay Criden a referral fee in exchange for referring Isaac Industries to the Joseph Saveri Law Firm.")).) Defendant's only response is that it did not review the notice of appearance and did not realize until 2014 that this was Plaintiffs' intent. However, its failure to timely read the pleadings in a case in which it appeared does not create a genuine issue of material fact over whether Plaintiffs intended to induce reliance when they filed the notice of appearance. Because there is no evidence of such an intent, these claims fail.

## IV.  CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED. This order also terminates as moot Plaintiffs' motion to retain confidentiality and the Court VACATES the March 10, 2015 hearing on that motion. (See Dkt. 65 at 3-4 ("In the event the Court grants summary judgment . . . this application should be moot.").)

**IT IS SO ORDERED.**

Dated: March 9, 2015

_____
Elizabeth D. Laporte
United States Magistrate Judge